[Cite as *State v. Beckwith*, 2012-Ohio-3076.]

# Court of Appeals of Ohio

EIGHTH APPELLATE DISTRICT
COUNTY OF CUYAHOGA

---

JOURNAL ENTRY AND OPINION
**No. 97318**

---

## STATE OF OHIO

PLAINTIFF-APPELLEE

vs.

## BRANDON BECKWITH

DEFENDANT-APPELLANT

---

**JUDGMENT:**
**REVERSED AND REMANDED**

---

Criminal Appeal from the
Cuyahoga County Court of Common Pleas
Case No. CR-542140

**BEFORE:** Sweeney, J., Celebrezze, P.J., and Keough, J.

**RELEASED AND JOURNALIZED:** July 5, 2012

**ATTORNEY FOR APPELLANT**

James E. Valentine, Esq.
323 Lakeside Avenue, Suite 450
Cleveland, Ohio 44113

**ATTORNEYS FOR APPELLEE**

William D. Mason, Esq.
Cuyahoga County Prosecutor
By: John R. Kosko, Esq.
        Norman Schroth, Esq.
Assistant County Prosecutors
Eighth Floor, Justice Center
1200 Ontario Street
Cleveland, Ohio 44113

JAMES J. SWEENEY, J.:

{¶1} Defendant-appellant Brandon Beckwith ("defendant") is appealing his convictions for aggravated murder, aggravated robbery, and kidnapping with gun specifications related to the murder of 19-year-old Eric Copley on the evening of March 14, 2008. For the reasons that follow, we reverse and remand for a new trial.

{¶2} On March 14, 2008, the body of Eric Copley was found by John Mahoney in front of his home located at 1075 East 76th Street in Cleveland, Ohio. Mahoney did not hear any gunshots or witness the incident. He was alerted to the presence of Eric's body by his dog barking.

{¶3} EMS and police responded to the scene. Eric was transported to the hospital where he was pronounced dead on arrival. The medical examiner ruled his death a homicide caused by a bullet wound through the heart. Eric had been shot in the back. According to the medical examiner, Eric would have been capable of purposeful movement for up to one minute after being shot.

{¶4} Cleveland police officer Charles Teel responded to the scene and recovered a bullet fragment near the rear bumper of a car, in the same general area where Eric's body was found. Teel did not speak to any witnesses in connection with the murder.

{¶5} The next day, the Copley family found some of Eric's belongings near the intersection of East 76th Street and Korman. Police responded to the scene, where they recovered Eric's right tennis shoe, some CDs, his phone charger, and shell casings.[1]

_____

[1]Notwithstanding this fact, there is some testimony in the record that police

Some of the evidence was not submitted for testing until March 2009 and March 2010. One bullet had been cleaned by an officer prior to examination and was therefore not tested for DNA. A fired cartridge casing that was received on March 16, 2010, was swabbed for DNA, which was determined to have come from an unknown female (State's Ex. 109, Item 18.1). Forensic testing excluded Eric's mom, defendant, and the codefendants, Sharvaise Robinson and Michael Hall as the source of this DNA. Similarly, DNA profiles obtained from Eric's sweatshirt and jeans matched Eric's DNA, and tests excluded defendant as a source of that DNA (State's Ex. 109 & 107).

{¶6} There were no eyewitnesses to the shooting. Police interviewed Connie Anderson on July 8, 2008. On March 14, 2008, Anderson was studying in her living room around 11:00 p.m. when she heard gunshots. They sounded as near as her driveway, which is located at the corner of East 76th Street and Korman. She frequently hears gunshots in the neighborhood and typically shuts off the lights, which she did on this occasion. Anderson looked out the window and saw a person wearing a hoodie.[2] Anderson believed the person was a man due to his stature but she could not decipher the person's race. She could not see what the person was looking at but noticed he had his hands in his pockets. Anderson went upstairs and was eventually able to see another person farther

did not consider the intersection as being part of the crime scene until they spoke with Connie Anderson in July of 2008.

[2]At trial, she stated the hoodie was light blue but had described it as white on a previous occasion.

west on the street; she believed this individual was also a man. He was on his knee and then rose to take a few steps but collapsed face first in what she described as a "dead man's fall." The person in the hoodie then jogged towards East 79th Street down Korman.

{¶7} Very concerned, Anderson yelled for her sons to get the phone. When it could not be readily located, she ran outside. Once outside, she could not see anything because of a thick fog. She bent down, where she had a clearer view, but did not see anyone. For that reason, she assumed the person was okay and never called police. Anderson did not witness the shooting and did not see the two people interact together at all.

{¶8} Earlier that night, Eric had been visiting his friend Michael Hall at the Halls' residence on East 77th Street. JoAnn Hall, who is Michael's mother, and some other witnesses testified that Eric was Michael's best friend. Defendant was also at the Halls' house with Michael and Eric that night. According to the record, defendant and Eric were not close friends but spent time together with Michael.

{¶9} Michael lived with his mother and several other people, including his niece, and codefendant Sharvaise Robinson, who is approximately his same age. Sharvaise had dated Eric at one time, and the two were friends on March 14, 2008. Sharvaise was not home that day.

{¶10} JoAnn sent Michael to the store with two family friends: Aniyah Collins and Tineeshia Paradise. Aniyah drove Michael to the store and then to his Aunt Sally's

house.  They were gone for over an hour.  On the way back to the Hall residence, they saw defendant walking up East 87th Street. He came from the direction of Ansel Avenue. Initially Aniyah refused to pick defendant up but changed her mind when Michael begged her to give him a ride.

{¶11}  According to both Aniyah and Tineeshia, defendant was angry because Michael had left him at the house with Eric and Norman.   Defendant asked Aniyah to take him home but she said no.   However, she agreed to do so for twenty dollars, which defendant paid her.   Michael decided to stay with defendant at his house. Aniyah and Tineeshia then proceeded with their plans to find somewhere to buy marijuana to smoke at Aniyah's house.

{¶12}   JoAnn Hall indicated that she loved kids and would always have the children's friends over at her house. According to her, both Eric and Brandon were over frequently as they were friends with Michael. JoAnn recalled that Michael left for the store on March 14, 2008.   About an hour and a half later, Brandon left her house.   Eric left about 45 minutes after Brandon, around 11 p.m.   Sometime later that night, Sharvaise returned home, and they learned of Eric's death.   JoAnn and Michael went to Eric's home and spoke to his mother.

{¶13}   JoAnn took Michael and Sharvaise to the police station because Eric's family was harassing them and accusing Michael of murdering Eric.   JoAnn did not know if the Copley's were also harassing defendant.   JoAnn did not make an official statement,

but testified that she is sure she would have told police that defendant was at her house that night.

{¶14} JoAnn confirmed that the area of East 77th Street is dangerous and she does not let her kids walk around in that area. She lived there for only ten months.

{¶15} Josephine Copley is Eric's mother. She testified that her son returned from work around 2:00 p.m. on March 14, 2008. He went to the Halls' home but came home around 10:30 p.m. Josephine testified that Eric received several phone calls and was going to return to the Halls' house. Josephine believed he took some CDs with him. Later police arrived to inform her of Eric's death. Michael came to her home shortly after and spoke to her.

{¶16} Josephine confirmed that she had cashed Eric's check the day prior and given him approximately $300 in cash. She believed he carried the money in his pocket. She did not receive any money when Eric's belongings were returned to her.

{¶17} According to the record, Eric arrived at the medical examiner's office nude after having received emergency treatment in the hospital. His clothes were examined for trace evidence.

{¶18} The Copleys began their own investigation the next day. By all accounts, Josephine kept in close contact with police and reported every lead she obtained.

{¶19} Sharvaise Robinson spoke with police on a number of occasions and never mentioned defendant. Sometime after Eric's death, Sharvaise moved to Miami, Florida, where she earned about $3,000 a night as "an exotic dancer." She claims that she did not

know that she had been charged in connection with Eric's death but was using a false name in Florida. U.S. Marshalls arrested her and brought her back to face murder, robbery, and kidnapping charges in Cuyahoga County. Sharvaise entered a plea agreement where she to pled guilty to significantly reduced charges, specifically a third degree felony obstruction of justice, in exchange for her testimony against defendant and Michael Hall.

{¶20} In February 2011, Sharvaise gave a statement to police. For the first time, she indicated that she had overheard defendant telling Michael Hall that he wanted to rob Eric. At one point in her testimony she said this took place a week before Eric's murder, but she also testified that it took place about three weeks before it. She said Eric was known to "flash" his money, and he had been robbed at least once. She told Eric what she had overheard and suggested he stop flashing his money.

{¶21} During her testimony the following exchange took place:

Q. All right. Did you speak to Michael —   just answer yes or no, that night, about the Eric Copley's homicide?

A. Yes.

Q. All right. Now, had you — when you heard about Eric's death, did you have any information concerning as to who did it?

A. Yes.

Q. All right. Tell us about that.

A. Well, he said Brandon did it.

**{¶22}** The trial court overruled the defense's motion for a mistrial and instead issued a curative instruction that essentially told the jurors to disregard the statement.

**{¶23}** Detective Lem Griffin also testified. Det. Griffin testified he was not assigned to this case but recalled that on March 18, 2008, the institutional guard from the lobby called him and advised that a male wanted to "turn himself in" for the homicide at East 76th and Korman. Repeatedly during his testimony, Det. Griffin stated that the institutional guard pointed out defendant to him. The trial court allowed this testimony over an objection from the defense.

**{¶24}** Det. Griffin stated that he asked defendant if he was there to turn himself in, and defendant reportedly said yes or confirmed it with body language such as nodding his head. However, Det. Griffin said that defendant "refused to speak." When Det. Griffin attempted to ask defendant questions, defendant would not respond. When he asked defendant, "was he involved in a homicide directly or indirectly, * * * he didn't answer." According to Det. Griffin, defendant did not say anything to him. Although defendant was booked at that time, he was later released.

**{¶25}** The trial court denied defendant's motions for acquittal, and the jury returned guilty verdicts on all counts and specifications. Sentence has been imposed, and defendant commenced a timely appeal. We address those assignments of error that are dispositive of this appeal.

**{¶26}** "Assignment of Error I: The trial court erred and abused its discretion in denying Appellant's motion for mistrial."

[T]he granting or denying of a motion for mistrial rests within the sound discretion of the trial court. * * * A mistrial should not be ordered in a criminal case merely because some error or irregularity has intervened, unless the substantial rights of the accused are adversely affected and this determination is, again, in the discretion of the trial court. (Citations omitted.)

*State v. Nichols*, 85 Ohio App.3d 65, 69, 619 N.E.2d 80 (4th Dist.1993). A court must only declare a mistrial "when the ends of justice so require and a fair trial is no longer possible." *State v. Franklin*, 62 Ohio St.3d 118, 580 N.E.2d 1 (1991).

{¶27} Defendant's motion for separate trials of codefendants was granted by the trial court in this case on February 21, 2011. One basis for the motion was defense counsel's belief that the state intended to introduce out-of-court statements that codefendant Hall had made to a Robert Dillard that allegedly inculpated defendant. Because codefendant Hall's case was pending, it was expected that he would be unavailable to testify at defendant's trial. Michael Hall was not called as a witness in this case.

{¶28} Defendant asserts that he was denied a fair trial when the jury heard codefendant Sharvaise testify that codefendant Hall told her defendant had killed Eric. There is no dispute that this testimony was inadmissible.

{¶29} *State v. Moritz*, 63 Ohio St.2d 150, 407 N.E.2d 1268 (1980), paragraphs one and two of the syllabus, held as follows:

An accused's right of cross-examination secured by the confrontation clause of the Sixth Amendment is violated in a joint trial with a non-testifying codefendant by the admission of extrajudicial statements made by the codefendant inculpating the accused. (*Bruton v. United States*, 391 U.S. 123, 88 S.Ct. 1620, 20 L.E.2d 476, followed)

A violation of an accused's right to confrontation and cross-examination is not prejudicial where there is sufficient independent evidence of an accused's guilt to render improperly admitted statements harmless beyond a reasonable doubt.

{¶30} That this statement was made in a separate trial is a distinction without a difference. The constitutional problem is the same; defendant was not able to cross-examine or confront codefendant Hall about this extrajudicial statement that inculpated him. Therefore, our task is to determine whether the court's curative instruction was an appropriate remedy to cure the error and any material prejudice suffered by the accused. *State v. Sage*, 31 Ohio St.3d 173, 182, 510 N.E.2d 343 (1987). Additionally, we will examine whether the statement's impact on the outcome of the trial was harmless beyond a reasonable doubt.

{¶31} Based on the paucity of the evidence against defendant in this record, we are compelled to find that a curative instruction was not adequate to cure the material prejudice of the statement, and it cannot be considered harmless beyond a reasonable doubt.

{¶32} We accept that the statement was not purposefully elicited. Still, the fact remains that the identity of Eric Copley's killer was the ultimate issue in this case.

{¶33} The state argues that the trial court's curative instruction was sufficient to overcome any taint or material prejudice from the statement and refers us to various cases

in support.[3]   However, all of these cases are distinguishable from the matter that is before us.

**{¶34}**   Most of the cases relied upon by the state do not involve a statement of this magnitude in a record that contains less than overwhelming evidence against the accused. For example, in *State v. Mobley,* 2d Dist. No. 18878, 2002 WL 506626, and in *State v. McCree*, 8th Dist. No. 87951, 2007-Ohio-268, the courts were examining whether a mistrial was warranted where there had been an isolated statement referencing the accused's criminal history. In *State v. McKinney*, 11th Dist. No. 2000-L-210, 2002-Ohio-4360, an isolated statement was made that the defendant refused to make a statement upon his arrest. In *State v. Jenkins,* 2d Dist. No. 23075, 2009-Ohio-6584, the court found that a witness's statement that Jenkins's friends robbed her at gunpoint, a fact that was unrelated to the robbery charges against Jenkins at trial, did not warrant a mistrial where the testimony was stricken with a curative instruction to the jury.

**{¶35}**   Without exception, all of the cases relied upon by the state involved cases that had significant separate evidence that supported the convictions than is found in this record. *State v. Woodward*, 10th Dist. No. 03AP-398, 2004-Ohio-4418, ¶ 35 ("the record contains sufficient separate evidence to support defendant's conviction"); *Mobley*, 2d Dist. No. 18878 ("even if the trial court's instruction had not cured the error, the

---

[3] The well-phrased and comprehensive curative instruction would have sufficed to overcome any prejudice of the inadmissible hearsay statement made by the codefendant had there been overwhelming separate evidence of defendant's guilt in this case.

detective's improper statement was harmless error [where the overwhelming evidence supported the finding of defendant's guilt]"); *McCree*, *supra*. (Where several witnesses had testified concerning McCree's involvement in the shooting, the court found "no showing that McCree suffered any prejudice or that his substantial rights were affected as a result of a [witness's] isolated reference to his criminal history"); *see also McKinney*, *supra,* and *Jenkins*, *supra*.

{¶36} The evidence against this defendant is purely circumstantial. Anderson saw what she believed to be two males in the street shortly after shots were fired, and one appeared injured. She did not see the shooting, she did not see a gun, and she did not see the two people together or either being robbed. She provided some sparse details regarding clothing.

{¶37} No one testified as to what defendant was wearing that day. No one mentioned ever seeing defendant with a gun. While more than one witness mentioned that Eric had a cell phone and was using it that evening, there are no phone records in evidence. There is no physical evidence tying defendant to the scene. Defendant made no admission when he appeared at the police station a few days after the incident. He refused to speak to the police.

{¶38} Sharvaise did testify she heard defendant say he wanted to rob Eric. Eric was known to flash his money and had been robbed at least once before. There is some evidence from which a trier of fact could infer that Eric was robbed on March 14, 2008, specifically the fact that his mother, the day before, gave him about $300 in cash, yet no

money was returned to her with his personal effects.   By all accounts, the area where Eric was killed is a high crime area where gunshots are a common occurrence in the neighborhood. We note that Anderson did not even call the police despite what she saw and heard that night.

**{¶39}** Defendant was seen walking from the direction of the Hall home that night and was angry with Michael for leaving him alone with Eric.

**{¶40}** While the foregoing is sufficient evidence to submit the case to the jury, it can hardly be considered overwhelming evidence of defendant's guilt.

> Whether [the] error was harmless beyond a reasonable doubt is not simply an inquiry into the sufficiency of the remaining evidence. Instead, the question is whether there is a reasonable possibility that the evidence complained of might have contributed to the conviction.

*State v. Conway*, 108 Ohio St.3d 214, 2006-Ohio-791, 842 N.E.2d 996, ¶ 78.

**{¶41}** Finally, it is of significant note that the trial judge's  initial inclination was to grant a mistrial as he expressed serious doubt that any instruction could cure the material prejudice of Sharvaise's statement. The law recognizes that there are times when statements are so prejudicial to an accused that even a limiting or curative instruction is not effective to alleviate the material prejudice caused by the statement.  *Bruton*, *supra*, ("there are some contexts in which the risk that the jury will not, or cannot, follow instructions is so great, and the consequences of failure so vital to the defendant, that the practical and human limitations of the jury system cannot be ignored * * *").

**{¶42}** We recognize that the declaration of a mistrial is an extreme remedy. However, an exhaustive review of the evidence presented in this case leads to the

inescapable conclusion that defendant's right to a fair trial was so jeopardized by Sharvaise's statement that Michael Hall "said Brandon did it" that a mistrial was warranted to meet the ends of justice.

**{¶43}** Under the unique circumstances of this case, the motion for a mistrial should have been granted. This assignment of error is sustained, defendant's convictions are reversed, and the case is remanded for a new trial.

**{¶44}** "Assignment of Error III: The evidence was insufficient to support the convictions."

**{¶45}** An appellate court's function when reviewing the sufficiency of the evidence to support a criminal conviction is to examine the evidence admitted at trial to determine whether such evidence, if believed, would convince the average mind of the defendant's guilt beyond a reasonable doubt. The relevant inquiry is whether, after viewing the evidence in a light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime proven beyond a reasonable doubt. *State v. Thompkins*, 78 Ohio St.3d 380, 386, 678 N.E.2d 541 (1997).

**{¶46}** The record evidence has been set forth previously in detail. Defendant contends that the evidence was insufficient as to his identity. Circumstantial evidence may be sufficient to establish the identity of the accused. *See, e.g.*, *State v. McKnight*, 107 Ohio St.3d 101, 2005-Ohio-6046, 837 N.E.2d 315, ¶ 75; *State v. Kiley*, 8th Dist. Nos. 86726 and 86727, 2006-Ohio-2469, ¶ 9.

**{¶47}** Circumstantial evidence is accorded equal weight and given the same deference as direct evidence. *Id.*

**{¶48}** Construing the evidence in a light most favorable to the prosecution, we must discern whether it was sufficient to submit the case to the jury for deliberations. Defendant said he wanted to rob Eric less than one month prior to Eric's death; defendant was with Eric shortly before the shooting; defendant left the Hall residence shortly before Eric left; Eric returned home around 10:30 p.m., but then decided to go back to the Hall residence after receiving some phone calls; shots were fired around 11:00 p.m.; two people (believed to be males) were seen in the street, one ran in the direction that defendant was later found walking, the other was headed in the direction where Eric's body was found. Eric had a significant amount of cash the day before his death, but no money was found on his person following his murder. Defendant paid twenty dollars for a ride home and presented himself to the police station a few days after Eric's murder with a number of his family members. There is sufficient circumstantial evidence from which the jury could find defendant guilty of the crimes charged.

**{¶49}** This assignment of error is overruled.

**{¶50}** Our disposition of the first and third assignments of error renders the remaining assignments of error moot.

**{¶51}** Judgment reversed and remanded for a new trial.

It is, therefore, considered that said appellant recover of said appellee his costs herein.

It is ordered that a special mandate be sent to said court to carry this judgment into execution.

A certified copy of this entry shall constitute the mandate pursuant to Rule 27 of the Rules of Appellate Procedure.


JAMES J. SWEENEY, JUDGE

FRANK D. CELEBREZZE, JR., P.J., and
KATHLEEN ANN KEOUGH, J., CONCUR